

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00565-CR

Tina Gabrielle **RENDON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 454th Judicial District Court, Medina County, Texas
Trial Court No. 21-03-13986-CR
Honorable Daniel J. Kindred, Judge Presiding

Opinion by:  Rebeca C. Martinez, Chief Justice

Sitting:  Rebeca C. Martinez, Chief Justice
Beth Watkins, Justice
Sandee Bryan Marion, Chief Justice (Retired)[1]

Delivered and Filed: August 23, 2023

AFFIRMED

A jury convicted appellant Tina Gabrielle Rendon of murder, and it assessed punishment at thirty-five years' imprisonment and a $5,000 fine. TEX. PENAL CODE ANN. § 19.02(b)(1)–(2). The trial court signed a final judgment in accordance with the jury's verdict. In two issues, Rendon complains that the trial court abused its discretion (1) by denying her motion for continuance and

---

[1] Retired Fourth Court of Appeals Chief Justice Sandee Bryan Marion assigned to this Court by the Chief Justice of the Supreme Court of Texas pursuant to the government code. *See* TEX. GOV'T CODE ANN. § 74.003.

(2) refusing her request for an instruction on the lesser-included offense of criminally negligent homicide.  We affirm.

## I. BACKGROUND

On the afternoon of August 22, 2020, Jennifer Monreal was in front of her mobile home cleaning her car.  Monreal noticed a van, operated by Rendon, driving toward the mobile home across from Monreal's residence at a high rate of speed.  Rendon parked the van in front of the neighboring house.  Next, Monreal heard Rendon and Bittnee Morganne Jones yelling at each other as Rendon, followed by Jones, walked from the front of neighboring mobile home to the van.  Monreal recalled Rendon telling Jones, "Leave me the f--- alone."  Rendon got in the driver's seat and began reversing.  When Rendon's van then stopped reversing, Jones got "in front of the van."  It then began inching forward, and Jones grabbed onto the hood of the van.  Monreal then witnessed Rendon "take[] off really fast."  As Rendon's van drove down the roadway, Monreal noticed that it was "moving to the side" or "jerking."  Although Monreal did not witness Jones get pulled underneath Rendon's van, soon after Rendon accelerated, Monreal saw Jones underneath it and Rendon's "van keeps going after [Jones] is underneath [it]."  Monreal called 9-1-1 to report the incident.

At approximately the same time, Bianca Sanchez drove into Monreal's neighborhood to drop off a friend.  Sanchez saw Jones, followed by Rendon's van, walking in the roadway away from Rendon.  Sanchez noted that Rendon's van was closely following Jones.[2]  Sanchez described seeing Jones "walking for a little bit and then that's when I saw her just go over, drive over her body."  Sanchez saw Rendon's van continue "going a little bit and I know she reversed a little bit

---

[2] Sanchez denied seeing Jones either hop on the van's hood or riding on the van's hood.

and either the body was still stuck under there because the back of the van, you could see when it was going kind of up and down a little bit and she moved forward a little bit."

During the investigation, law enforcement officers took a photograph, admitted into evidence, that shows the lower half of Jones's body protruding out from underneath Rendon's van and pressed up against the front of the driver's side back tire. Also admitted into evidence is body-worn camera ("bodycam") footage of a law enforcement officer guarding Rendon while she sat in an interrogation room. On the bodycam, Rendon can be heard saying, "And look what I did to her. It wasn't her time to go. It wasn't her time to go. It was her time to shine. And look what I did to her."

Kimberley Molina, M.D., a forensic pathologist, performed an autopsy on Jones, and she determined that Jones died because of blunt force injuries. During the autopsy, Dr. Molina took photographs of Jones's injuries. In one photograph, admitted into evidence, Dr. Molina explained that:

> In this case you can see that towards the ankle on the left but then really the ankle, the side of the foot, the lower leg on the right, that abrasion has extended actually all the way through the skin into the muscle and has caused what we call a laceration or a tearing of the muscle; and in this particular case it's gone all the way down to the bone, so some of that bone has actually been shaved off as well, consistent again, with kind of that dragging process.

Jones's internal organs also sustained significant injuries. Dr. Molina explained that both sides of Jones's ribs sustained multiple displaced fractures, her lungs evidenced some injury, and her liver was "torn." A toxicology analysis revealed that "methamphetamine was detected but we were unable to give a number because it was so low that it was beneath what we call our limit of quantitation, meaning, it was lower than our given number to it, so it was a very small amount."

On Monday, June 13, 2022, the date jury selection began, Rendon filed a motion for continuance. The motion sought more time to investigate three categories of evidence tendered

by the State in the week leading up to trial and accused the State of making an improper "threat." First, Rendon highlighted four supplemental police reports tendered by the State on June 9, 2022. Second, on June 10, 2022, the State, according to Rendon, disclosed for the first time that Monreal had identified two additional individuals present at Jones's residence "in the moments leading up to the incident." Third, Rendon highlighted that a third eyewitness, Gidget Torres, had disclosed that she provided an oral statement about the incident to a law enforcement officer who wore a bodycam. Rendon complained that she had not received any bodycam footage of Torres's interaction with investigating officers. Regarding the State's "threat," Rendon's trial counsel is affiliated with an attorney who represented Torres in an unrelated criminal proceeding that had been dismissed. Rendon asserted that the State "threatened" to re-file the previously dismissed charge against Torres.

The State did not contest Rendon's motion for continuance. However, it emphasized that it had timely advised Rendon's counsel about any additional information. Regarding Monreal's recollection of potential additional witnesses, a prosecuting attorney informed the court:

> I received a phone call from a known witness, Jennifer Monreal, that the defense knows about. Ms. Monreal called me of her on [sic] volition to say, "Oh, I just remembered this. There is this guy and a girl that showed up in a car before all this happened." I don't know who they are. I have the first name of one of the individuals but that's it. We didn't have enough to go and interview anyone but what I did do is I wrote an e-mail as soon as I hung up, sent it to defense, "Hey, [Monreal] just called me. Wanted you to know. Thanks."

The court overruled Rendon's motion for continuance with the caveat, "any witnesses that weren't disclosed when required, of course, are not going to be able to testify." Although the clerk's record contains a subpoena, issued by Rendon, that commanded Torres to appear at trial, there is no indication in the reporter's record that Torres testified.

The jury charge offered the jury the option to find Rendon guilty or not guilty of either murder or manslaughter. Rendon requested that the jury charge also include criminally negligent homicide. Specifically, Rendon argued:

> The defense only has to bring a scintilla of evidence, and here we have that because we have [Rendon's] own statements on the record that the State played from the video that said this was an accident, this was not intentional. Additionally, we have that the deceased was on meth and jumped on the hood of the car. I think that, that is something that you would fail to perceive an ordinary person of someone being on meth jumping on your car. And the facts that we have in the record shows that this could be criminally negligent homicide, so it should be included for the jury to decide. It's a matter of fact.
>
> . . .
>
> So[,] you have to have an unjustifiable risk, and I believe the unjustifiable risk is that you have someone that has meth in their system running in front of your car — at some point in front of your car. That's not something that can be anticipated.

The State responded by arguing that there was no conflict between Monreal's and Sanchez's testimony and that Rendon was impermissibly focusing on the altercation on Jones's front yard rather than at the time Rendon ran over Jones. The trial court refused Rendon's requested instruction.

A jury convicted Rendon of murder, and it assessed punishment at thirty-five years' imprisonment and a $5,000 fine. The trial court signed a final judgment in accordance with the jury's verdict, and Rendon timely appealed.

## II. Discussion

### A. Continuance

In Rendon's first issue, she argues that the trial court abused its discretion by denying her motion for continuance because her trial counsel needed more time to investigate three categories of evidence tendered by the State in the week leading up to trial. The State responds by arguing

that Article 29.06 of the Texas Code of Criminal Procedure[3] governed the trial court's analysis of Rendon's motion for continuance, and it did not abuse its discretion because Rendon's motion failed to name any absent witness and state that "the witness is not absent by the procurement or consent of the defendant." *See* TEX. CODE CRIM. PROC. ANN. art. 29.06.

"The granting or denying of a motion for continuance is within the sound discretion of the trial court." *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006). Therefore, we review a trial court's ruling on a motion for continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007). "[I]n order to show reversible error predicated on the denial of a pretrial motion for continuance, a defendant must demonstrate both that the trial court erred in denying the motion and that the lack of a continuance harmed [her]." *Gonzales v. State*, 304 S.W.3d 838, 843 (Tex. Crim. App. 2010). A defendant's bare assertion that her defense counsel did not have adequate time to interview witnesses does not alone establish prejudice.

---

[3] Article 29.06 of the Texas Code of Criminal Procedure provides:

> In the first motion by the defendant for a continuance, it shall be necessary, if the same be on account of the absence of a witness, to state:

> 1. The name of the witness and his residence, if known, or that his residence is not known.
> 2. The diligence which has been used to procure his attendance; and it shall not be considered sufficient diligence to have caused to be issued, or to have applied for, a subpoena, in cases where the law authorized an attachment to issue.
> 3. The facts which are expected to be proved by the witness, and it must appear to the court that they are material.
> 4. That the witness is not absent by the procurement or consent of the defendant.
> 5. That the motion is not made for delay.
> 6. That there is no reasonable expectation that attendance of the witness can be secured during the present term of court by a postponement of the trial to some future day of said term. The truth of the first, or any subsequent motion, as well as the merit of the ground set forth therein and its sufficiency shall be addressed to the sound discretion of the court called to pass upon the same, and shall not be granted as a matter of right. If a motion for continuance be overruled, and the defendant convicted, if it appear upon the trial that the evidence of the witness or witnesses named in the motion was of a material character, and that the facts set forth in said motion were probably true, a new trial should be granted, and the cause continued or postponed to a future day of the same term.

TEX. CODE CRIM. PROC. ANN. art. 29.06.

*Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995). The record must show with considerable specificity how defendant was harmed without the additional preparation time he requested. *Gonzales*, 304 S.W.3d at 842 (citation omitted). A defendant can ordinarily make such a showing only at a hearing on a motion for new trial because only then will she be able to produce evidence regarding what additional information, evidence, or witnesses the defense would have had available if the trial court had granted the motion for delay. *Id*. at 842–43 (quoting 42 George E. Dix & Robert O. Dawson, 42 *Texas Practice: Criminal Practice and Procedure* § 28.56, at 532–33 (2d ed. 2001)).

None of the three categories of evidence that Rendon highlights supports a conclusion that the trial court's denial of her motion for continuance caused harm. First, regarding the four supplemental police reports, Rendon fails to explain what additional information is contained in the supplemental reports, how each varies from its original, and what additional trial preparation Rendon's trial counsel believed the supplemental reports warranted. Second, regarding the two unidentified witnesses Monreal identified, Rendon argues that "[h]ad the Motion for Continuance been granted, Appellant's trial counsel would have had time to investigate [those witnesses], the result of which would have almost certainly change[d] the outcome of trial." This assertion lacks the requisite specificity. *See id*. at 842. Moreover, although Rendon re-urged this ground in her motion for new trial, filed twenty-nine days after the jury rendered its verdict, she tendered no evidence. Accordingly, there is no evidence that failure of Rendon's trial counsel to interview the two unidentified witnessed caused her any harm. *Cf. id*. at 842–43. Third, the same may be said regarding Rendon's concern that bodycam footage of Torres's statements to law enforcement officers *may* exist but was not tendered to her trial counsel. It is clear from Rendon's motion for continuance that she learned of the possible existence of the bodycam footage from her trial counsel's interview of Torres. Moreover, Rendon caused a trial subpoena to be served on Torres,

but she did not testify at trial. Rendon fails to explain with sufficient specificity how ascertaining whether the bodycam footage existed — over and above her evidenced access to Torres — harmed her, especially in light of the fact that Torres was subpoenaed but never called to testify at trial. *Cf. id.*

Regarding the State's "threat," Rendon contends that "[w]hen a prosecutor uses threats or intimidation to dissuade a witness from testifying[,] it infringes upon the defendant's due process rights to a fair trial." The record contains no factual findings regarding Rendon's assertion. At this juncture and taking Rendon's assertion as she frames it — against the backdrop of the rules governing a trial court's denial of a motion for continuance — we cannot say that Rendon has established that she was harmed by what she contends was a "threat" by the State.[4]

For these reasons, we conclude that the trial court did not abuse its discretion by denying Rendon's motion for continuance. We overrule Rendon's first issue.

## B.      Lesser-Included Offense

In Rendon's second issue, she argues that the trial court erred in failing to instruct the jury on the lesser-included offense of criminally negligent homicide. *See* TEX. PENAL CODE ANN. § 19.05. We review a trial court's refusal to include a lesser-included offense instruction in its charge to the jury for an abuse of discretion. *Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023) (citing *Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004)).

### 1.      First Step

Whether a defendant is entitled to a jury instruction on a lesser-included offense involves a two-step analysis. *Safian v. State*, 543 S.W.3d 216, 219–20 (Tex. Crim. App. 2018). Under the

---

[4] We note that, in the trial court, Rendon filed a separate motion to dismiss based on her assertion that the State's "threat" violated her due process rights. Rendon does not refer us to any part of the appellate record that contains a ruling on her motion.

first step, we must decide whether the offense is a lesser-included offense of the offense charged, as defined in Texas Code of Criminal Procedure Article 37.09. *See* TEX. CODE CRIM. PROC. ANN. art. 37.09; *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998) ("The first step is to apply the relevant definition to the offense charged and the offense in question."). This is a question of law that does not depend on the evidence produced at trial. *Safian*, 543 S.W.3d at 220. In its briefing, the State concedes that the first step in the analysis is satisfied here. *See Britain v. State*, 412 S.W.3d 518, 520 ("Criminally negligent homicide is a lesser-included offense of manslaughter because it includes all the elements of manslaughter except for manslaughter's higher culpable mental state.").

### 2. Second Step

Under the second step, we must evaluate the evidence to determine whether there is some evidence that would permit a rational jury to find that the defendant, if she is guilty, she is guilty only of the lesser-included offense. *See Safian*, 543 S.W.3d at 220. The evidence must be evaluated in the context of the entire record, and there must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting her of the lesser-included offense. *Moore*, 969 S.W.2d at 8. The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Bullock v. State*, 509 S.W.3d 921, 925 (Tex. Crim. App. 2016); *Moore*, 969 S.W.2d at 8. Any evidence that the defendant is guilty only of the lesser-included offense is sufficient to entitle the defendant to a jury charge on the lesser-included offense. *Moore*, 969 S.W.2d at 8.

For a lesser-included offense instruction to be required, the evidence suggestive of the lesser offense must be more than a jury's disbelief of evidence establishing the greater offense. *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003), *abrogated on other grounds by Grey v. State*, 298 S.W.3d 644 (Tex. Crim. App. 2009). "[T]here must be affirmative evidence to

rebut the greater element, and the jury may not simply disbelieve evidence establishing the greater." *Schmidt v. State*, 278 S.W.3d 353, 362 (Tex. Crim. App. 2009); *see also Segundo v. State*, 270 S.W.3d 79, 90–91 (Tex. Crim. App. 2008) (holding trial court properly denied lesser-included offense instruction because evidence showed only that medical examiner said it was possible for sperm to remain in person's vaginal vault for up to 72 hours, but that evidence raised only theoretical possibility that rape and murder could be disconnected in time and space, and no evidence in record showed that victim's rape and murder were, in fact, disconnected based on medical evidence that they occurred at the same time); *Enriquez v. State*, 21 S.W.3d 277, 279–280 (Tex. Crim. App. 2000) (holding trial court erred by giving lesser-included offense instruction for lesser amount of marijuana because chemist only tested one bundle of several in evidence); *Hampton*, 109 S.W.3d at 441 (holding trial court erred by including instruction on lesser-included offense of sexual assault because complainant testified knife was used during sexual assault and failure to find knife was not affirmative evidence that no knife was used).

The difference between criminally negligent homicide and manslaughter is the culpable mental state. *Stadt v. State*, 182 S.W.3d 360, 364 (Tex. Crim. App. 2005); *Aliff v. State*, 627 S.W.2d 166, 171 (Tex. Crim. App. 1982); *Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975). The offense of manslaughter "involves conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards it." *Stadt*, 182 S.W.3d at 364 (quoting *Lewis*, 529 S.W.2d at 553). On the other hand, the offense of criminally negligent homicide "involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof [but fails] to perceive the risk." *Id*. (quoting *Lewis*, 529 S.W.2d at 553). Therefore, before a charge on criminally negligent homicide is required, the record must contain evidence showing an unawareness of the risk. *Mendieta v. State*, 706 S.W.2d 651, 653 (Tex. Crim. App. 1986); *Licon v. State*, 99 S.W.3d 918, 928 (Tex.

App.—El Paso 2003, no pet.); *Ybarra v. State*, 890 S.W.2d 98, 111 (Tex. App.—San Antonio 1994, pet. ref'd).

### 3.    Analysis

To satisfy the second step, Rendon argues that "there was evidence that [Rendon] was simply driving away from the scene and that the decedent jumped in front of her moving vehicle and grabbed onto it." As support, Rendon references two portions of Monreal's testimony and law enforcement bodycam footage.   First, Rendon references the State's direct examination of Monreal, wherein she testified:

> Q.    Okay.  And what is the driver of the van doing at that point?
>
> A.    She starts going forward.  After reversing, starts going forward and the deceased is standing in front of the van and so she's backing up and then pretty much, yeah, backing up away from the van as she was going forward.
>
> . . .
>
> Q.    Okay.  What happens at that point?
>
> A.    Then the deceased grabs on to the hood.
>
> Q.    Okay.  And then what?
>
> A.    And the driver takes off really fast.

Second, Rendon references her cross examination of Monreal wherein Rendon asked, "Now, you told us here today that the deceased jumped on the van, correct?"  Monreal answered, "[s]he had bounced onto it, yes."  Rendon followed up by asking, "[s]he jumped onto it," which Monreal answered, "[y]es."   Third, Rendon asserts that "the State played recordings for the jury of Appellant expressing that this was an accident and was not intentional."  Rendon contends that these three pieces of evidence would allow a rational jury to "have found that [Rendon] did not intentionally hit [Jones] but instead was negligent in not perceiving the risk of driving away, knowing someone was coming after her."

The State responds by arguing that Rendon's contention "wholly fails to account for the fact that it is wholly speculative and not supported by any testimony from [Rendon] that would constitute some evidence of her unawareness of the risk posed by her conduct." The record is indeed devoid of any evidence showing that Rendon was unaware of the risk. Monreal's testimony provides no evidence that Rendon was unaware of the risk of injuring Jones by accelerating the van forward after Jones had "grab[bed] on to the hood." Rendon's reference to the law enforcement officer's bodycam footage fails to pinpoint any specific statement by her. Rendon's statement, "And look what I did to her. It wasn't her time to go. . . . It was her time to shine. And look what I did to her[,]" may be characterized as contrition. However, it too is no evidence that Rendon was unaware of the risk. Therefore, we conclude that the trial court did not abuse its discretion in refusing to instruct the jury on the lesser-included felony offense of criminally negligent homicide. We overrule Rendon's second issue.

### III. CONCLUSION

We affirm the trial court's judgment.

Rebeca C. Martinez, Chief Justice

DO NOT PUBLISH